Stephen SMITH, Dec., Appellant,

v.

**CAPITAL REGION MEDICAL CENTER, Respondent.**

**No. WD 75078.**

Missouri Court of Appeals,
Western District.

March 26, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 2013.

Application for Transfer Denied Aug. 13, 2013.

John Boyd, Kansas City, MO, for Appellant.

Richard Montgomery, Jr., Columbia, MO, for Respondent.

Before: GARY D. WITT, P.J., THOMAS H. NEWTON, J., and ZEL M. FISCHER, Sp. J.

THOMAS H. NEWTON, Judge.

On behalf of her deceased husband Stephen Smith (Smith), Dorothy Smith (the claimant) appeals the Labor and Industrial Relations Commission's decision denying the claim for workers' compensation because the claimant failed to meet her burden of proof that her husband sustained an

occupational disease arising out of and in the course of his employment with Capital Region Medical Center. The claimant contends that the Commission erred as a matter of law because it required her to prove a specific source of injury before work could be considered a substantial factor in causing Smith's occupational disease. She also asserts that the Commission erred in finding the medical opinion of employer's expert to be more credible than the medical opinion of her expert. We reverse and remand.

Smith filed a claim for workers' compensation on April 28, 2006, alleging that on or about April 20, 2005, he suffered an accident, a series of accidents, or an occupational disease as a result of an occupational exposure that caused an injury to his body as a whole. Smith was diagnosed with hepatitis in 1991, and he claimed that the medical evidence established that he contracted hepatitis C while working for Capital Region. Smith died on February 27, 2007. The cause of death was sepsis, hepatitis C, and acute tubular neurosis.

Smith worked for Capital Region from 1969 until March 2006 as a laboratory technologist. In this position, Smith withdrew blood from patients, worked with blood and blood products every day. Smith worked for Capital Region for a number of years before the implementation of safety measures, which are commonplace today.[1] For several years, Smith and his co-workers did not wear gloves while working. Thus, if Smith had a lesion of any kind on his hand, the possibility existed of blood coming into contact with that lesion. Moreover, for several years, Smith and his co-workers prepared blood slides by use of a "pipette," which is essentially a narrow glass straw. Smith would place one end of the pipette into a vacuum tube of blood and then place his mouth on the other end of the pipette to suction some of the blood into the pipette. Thus, the possibility of accidentally suctioning blood into the mouth existed. For several years, Smith and his co-workers were not provided with face shields. Thus, the possibility existed of blood being splattered into Smith's face, particularly when blood was being centrifuged. Further, the possibility of a needle stick or a cut was present during Smith's entire tenure with Capital Region, but his co-workers noted that needle sticks were infrequent. Smith never reported a needle stick to his employer, but his employer also did not require the reporting of such incidents until sometime in the 1980s or 1990s.

Smith's wife, who was a registered nurse and had worked for Capital Region, and Smith's co-workers testified that they came into contact with blood regularly. Smith's co-workers performed the same job duties as Smith and said that they had gotten blood in their mouths while pipetting. One of Smith's co-workers and Smith's wife also said that they had experienced needle sticks during their careers. Smith's wife said that she had experienced numerous needle sticks and had blood of patients or bodily fluids of patients upon her person several times a week. Smith's wife also said that she observed cuts or bandages on Smith's fingers. Smith's co-workers and Smith's wife on occasions noticed spots of blood on Smith's protective

1. None of the witnesses who testified at the hearing were able to pinpoint exactly when those safety changes occurred but suggested that these changes occurred sometime in the 1980s or 1990s. According to claimant's expert, Dr. Allen Parmet, OSHA standards now require medical personnel to wear gloves and wear eye or face shields when handling bodily fluids. He also said that needles are now "single injectable needle[s]" with "automatic cover[s]." Dr. Parmet said that medical personnel no longer recap needles.

lab coat or clothing, but none of them said that they ever saw blood on Smith's face, saw him ingest blood by pipetting, or saw him suffer a needle stick.

Smith's wife testified that Smith was wounded with a shotgun in a hunting accident in 1970. As a result of the gunshot wound, Smith underwent surgery and was given blood transfusions, with six units of blood. Other than the blood transfusions, Smith's wife said that her husband did not engage in any type of activities away from work where he could come into contact with other humans' bodily fluids. Smith did not use intravenous drugs; he did not have tattoos; and he was not a member of the military and never went to the orient.[2]

Smith was first given the diagnosis of hepatitis in 1991, when he was hospitalized for abdominal pain and blood tests revealed elevated liver enzymes. The hepatitis was later typed as hepatitis C.[3] On April 20, 2005, claimant brought Smith to the emergency room because he was confused and lethargic. At that time, Smith was diagnosed with hepatic encephalopathy. Smith continued to try to work for Capital Region after this time, but, due to health problems associated with his disease, Smith was unable to work after March 2006. Thereafter, on April 28, 2006, Smith filed his claim for workers' compensation. While his claim was pending, Smith died on February 27, 2007. His cause of death was sepsis, hepatitis C, and acute tubular neurosis. Smith's wife was allowed to substitute herself for Stephen Smith as the claimant in this case.

At the hearing, the claimant and Capital Region presented competing expert medical evidence on the issue of causation of Smith's hepatitis C. Claimant presented the deposition testimony of Dr. Allen Parmet, who opined that Smith's work for Capital Region was the likely cause of contracting hepatitis C. According to Dr. Parmet, the number one cause of hepatitis C "is blood borne, that is by transfusion of blood or body products," which can occur by transfusion or by needle stick. Dr. Parmet noted that Smith worked for Capital Region for many years handling blood and body products before the health care industry began to pay attention in the mid–1990s to the safety risks posed by blood-borne pathogens. Dr. Parmet identified the risk of blood splashing into Smith's eyes, nose, and mouth and opined that needle sticks are a very significant risk factor for all phlebotomists and laboratory personnel. Indeed, Dr. Parmet found that Smith's job placed Smith in the highest risk group for hepatitis C infection. Dr. Parmet stated that Smith reported that he suffered multiple needle sticks while working. Dr. Parmet acknowledged that receiving a blood transfusion in 1970 was a major risk factor for contracting hepatitis C but ultimately opined that Smith's work for Capital Region and Smith's daily exposure to blood and body products for many years was the largest risk factor and the most probable source causing Smith to contract hepatitis C, either through a needle stick or otherwise handling blood or body products.

In regard to the period of time after a person is exposed to hepatitis C and the time a patient can predictably become symptomatic, Dr. Parmet said that there is an average incubation period of six weeks between the initial exposure and the development of acute hepatitis syndrome. That syndrome includes flu-like symptoms of

2. A study has suggested that military servicemen and women who have served in Southeast Asia have an increased risk of contraction of hepatitis C.

3. There was no way to test for hepatitis C prior to 1991.

general aches, pains, malaise, fevers but rarely jaundice. Dr. Parmet stated, however, that not everyone who gets the infection develops the acute syndrome. Dr. Parmet said that half to two-thirds of people are completely asymptomatic and never know when the initial infection was acquired. Following this incubation period, there is a latency period where the hepatitis C virus is slowly growing, replicating, and damaging the liver. According to Dr. Parmet, the minimum time from onset of the infection to onset of actual liver disease is seven years, with fifteen years being the average.

Dr. Parmet said that Smith's blood transfusion of six units of blood as a result of the gunshot incident was a major risk factor for developing hepatitis C. Dr. Parmet said that Smith's risk of getting hepatitis C from the six units of blood (because the transfusions occurred prior to screening tests being performed on the blood) was essentially six percent. When asked whether he had an opinion whether Smith's blood transfusion in 1970 either caused or contributed to the cause of the development of hepatitis C in Smith, Dr. Parmet opined:

> Based on [the] statistics, as well as [Smith's] own medical history absent any symptoms of cirrhosis, liver disease prior [to] the 1990s, no evidence of development of cirrhosis until after 2000, it seems highly improbable that the blood transfusion of [1970][4] would have been causal, first of all, because the absolute risk was 6 percent and so then half of all people who have hepatitis C should have developed cirrhosis within 15 years or about 1985. And yet [Smith] doesn't develop cirrhosis for 30 years, which

would put him down in the very few percentage of people who do develop cirrhosis with that long a latency.

On cross-examination, however, Dr. Parmet testified that the website of his current employer, St. Luke's Hospital, indicated that a person could live with hepatitis C for 15 years or longer before it is even diagnosed. Dr. Parmet explained the average time from infection with hepatitis C to when a person becomes symptomatic is 15 years. So according to Dr. Parmet, half of the people with hepatitis C will become symptomatic before 15 years, and half of the people will go at least 15 years before being symptomatic.[5]

Dr. Parmet testified that needle sticks were a very significant risk factor for phlebotomists and laboratory personnel and occurred quite frequently prior to the institution of OSHA standards. Dr. Parmet said that he was involved in a study in the late 1980s that looked at the statistical risk of acquiring infection comparing the HIV/AIDS virus to hepatitis B and hepatitis C. Dr. Parmet testified that the study found that there was about a two percent risk of acquiring the HIV/AIDS infection from a needle stick, but there was a 10 to 20 percent risk of acquiring hepatitis C from a needle stick if you had a known positive hepatitis C donor. Dr. Parmet said that the risk was even higher for hepatitis B. According to Dr. Parmet, subsequent studies have been consistent with and validated the study in which he participated. The risk of contracting hepatitis C from an unknown donor in the general American population, however, is about one percent.

---

4. In his testimony, Dr. Parmet stated that it was "improbable that the blood transfusion of 1990 would have been causal[.]" The evidence, however, clearly established that Smith received the blood transfusion in 1970.

5. Although Dr. Parmet used the term average, he was really describing the median time in which someone would develop hepatitis C.

Dr. Parmet opined that it was "more likely than not that ... Smith acquired his hepatitis C infection due to his occupational exposure at Capital Region Medical Center, either by a needle stick or by handling blood and body products." Dr. Parmet said that Smith's exposure to needle sticks and Smith's handling blood and body products was the prevailing factor in Smith's developing hepatitis C. Dr. Parmet stated that Smith's work was "clearly the largest risk factor and the most probable source" of his hepatitis C. Further, Dr. Parmet said that, to a reasonable degree of medical certainty, it was "more probable than not that the 1991 recorded symptoms of Stephen Smith [were] the medically competent producing cause of the hepatitis C."

Capital Region's expert, Dr. Bruce Bacon, reviewed Smith's medical reports and produced a report, dated January 7, 2009, which was admitted into evidence. Dr. Bacon opined that Smith likely contracted hepatitis C when he got the 1970 blood transfusion. According to Dr. Bacon, it is well known that blood transfusions prior to 1992 were frequently contaminated with hepatitis C. Dr. Bacon said that seven to ten percent of individuals who received blood transfusions prior to 1992 contracted hepatitis C from the blood transfusion. Dr. Bacon noted that laboratory tests performed on Smith in 1990 showed mildly elevated liver enzymes and that a liver scan done at the same time showed diffuse hepatocellular dysfunction. Further, Dr. Bacon noted laboratory tests performed when Smith was hospitalized in 1991 showed "a low albumin level of 3.0 with a total bilirubin level that was increased at 3.2." According to Dr. Bacon, these findings along with the elevated liver enzymes are consistent with chronic liver disease.

Further, Dr. Bacon indicated that there was "no evidence that [Smith's] illness in 1991/1992 was an acute infection with hepatitis C." Rather, Dr. Bacon found that the findings in 1991/1992 were consistent with chronic hepatitis C and would be consistent with someone having been exposed at the time of the blood transfusion 20 years earlier. According to Dr. Bacon, the average time for progression from exposure to hepatitis C to cirrhosis is usually 20 to 30 years. Dr. Bacon, therefore, concluded that in Smith's case, the "likely scenario" was that Smith "contracted hepatitis C at the time of blood transfusion in 1970, had developed chronic liver disease by the time of his admission to the [hospital] in 1991 and then developed complications that ultimately caused his death in 2006." Dr. Bacon said he offered this opinion "to a reasonable degree of medical certainty." Dr. Bacon said that, because there was no documentation that there ever were any needle sticks or blood exposures during [Smith's] employment, it [was] hard to implicate this as a possible cause of his infection with hepatitis C."

The Division of Worker's Compensation Administrative Law Judge (ALJ) held a hearing on November 30, 2010. After the hearing, the ALJ determined that Smith did not sustain an accident or an occupational disease arising out of and in the course of his employment with Capital Region. The claimant appealed this decision to the Labor and Industrial Relations Commission, which affirmed the ALJ's decision denying compensation. The Commission found that the claimant failed to meet her burden of proof that Smith sustained an occupational disease arising out of and in the course of his employment with Capital Region. The Commission concluded that the claimant produced no evidence that Smith was exposed to hepatitis C in the workplace and that the causation opinion of claimant's expert lacked credibility. The claimant appeals.

■ Before addressing the merits of claimant's appeal, we note that Capital Region has asked us to strike the claimant's brief and to dismiss her appeal because the claimant failed to comply with the briefing requirements of Rule 84.04. "While not condoning noncompliance with the rules, a court will generally, as a matter of discretion, review on the merits where disposition is not hampered by the rule violations." *Lewis v. Biegel,* 204 S.W.3d 354, 364 n. 10 (Mo.App.2006) (internal quotes and citation omitted). The deficiencies complained of by Capital Region do not impede the disposition of this appeal. We, therefore, deny Capital Region's requests to strike the claimant's brief and to dismiss the appeal.

■ We review the findings of the Commission and not those of the ALJ. *Jackson v. Stahl Specialty Co.,* 310 S.W.3d 707, 710 (Mo.App.2010). This court may modify, reverse, remand for rehearing, or set aside the award of the Commission only if it determines that the Commission acted in excess of its powers, that the award was procured by fraud, that the facts found by the Commission do not support the award, or that there was not sufficient competent evidence in the record to warrant making the award. § 287.495.1, RSMo 2000. We review the whole record to determine whether there is sufficient competent and substantial evidence to support the award or if the award is contrary to the overwhelming weight of the evidence. *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003). The Commission is free to believe or disbelieve any evidence, and we defer to the Commission's credibility determinations. *Clark v. Harts Auto Repair,* 274 S.W.3d 612, 617 (Mo.App.2009). "We are not bound, however, by the Commission's determinations of questions of law, which we review independently." *Wilcut v. Innovative Warehousing,* 247 S.W.3d 1, 3 (Mo.App.2008).

■ In her first point on appeal, the claimant asserts that the Commission erred as a matter of law because it required her to prove a specific source of injury before work could be considered a substantial factor in causing her husband's occupational disease. The Commission found that the claimant did not meet her burden of proof in that she failed to provide evidence that Smith was exposed to hepatitis C in the workplace. In so concluding, the Commission found:

> Employee did work for employer for many years (from 1969 until 2006) and so it would certainly *seem* that one or more patients with [hepatitis C] must have [been], at some point, treated at the hospital. But we cannot speculate as to these pivotal facts, nor can we fill in the gaps in the evidence with our own conjecture. As it stands, we are faced with a claim for occupational disease where there is no evidence that the disease was ever present in the workplace. We conclude that, absent such evidence, the case for exposure fails.[6]

Section 287.067.6, RSMo 2000,[7] provides, "Any employee who is exposed to and contracts any contagious or communicable disease arising out of and in the course of his or her employment shall be eligible for benefits under this chapter as an occupational disease." Section 287.067.1 defines "occupational disease" as "an identifiable disease arising with or without human fault and in the course of the employ-

6. The emphasis was in the original.

7. The Commission found that Smith's date of injury arose prior to the 2005 changes to the workers' compensation law, and, as a result, the law in effect prior to August 28, 2005, applied.

ment." However, section 287.067.1 states further that "[o]rdinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where the diseases follow as an incident of an occupational disease as defined in this section."

■■■ The parties in our case do not dispute that hepatitis C is a communicable disease. Before, however, an employee is entitled to worker's compensation for a communicable disease, the communicable disease must arise out of and in the course of the employee's employment. *Vickers v. Mo. Dep't of Pub. Safety,* 283 S.W.3d 287, 291 (Mo.App.2009); *Simmons v. Bob Mears Wholesale Florist,* 167 S.W.3d 222, 225 (Mo.App.2005). "To meet the test of an injury 'arising out of' the employment, the injury must be a natural and reasonable incident of the employment, and there must be a causal connection between the nature of the duties or conditions under which employee is required to perform and the resulting injury." *Simmons,* 167 S.W.3d at 225. " 'In the course of employment' refers to the time, place and circumstances of an employee's injury." *Id.* (citation and internal quotation marks omitted).

■■■ A workers' compensation claimant "bears the burden of proof to show that [the] injury was compensable in workers' compensation." *Johme v. St. John's Mercy Healthcare,* 366 S.W.3d 504, 509 (Mo. banc 2012). The burden of proof has two parts: the burden of production and the burden of persuasion. *White v. Director of Revenue,* 321 S.W.3d 298, 304 (Mo. banc 2010). As the *White* court explained:

> The burden of production is "a party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against the party in a peremptory ruling such as summary judgment or a directed ver-

dict." BLACK'S LAW DICTIONARY 223 (9th ed.2009). The burden of persuasion is defined as "[a] party's duty to convince the fact-finder to view the facts in a way that favors that party." *Id.*

*White,* 321 S.W.3d at 304–05.

In this case, the claimant bears the burden of producing evidence establishing a causal connection between the conditions of employment and the occupational disease. *Vickers,* 283 S.W.3d at 292. In regard to causation, the *Vickers* court explained:

> "To prove causation it is sufficient to show 'a recognizable link between the disease and some distinctive feature of the job which is common to all jobs of that sort.' " And, "there must be evidence of a direct causal connection between the conditions under which the work is performed and the occupational disease." However, the cause and development of an occupational disease is not a matter of common knowledge. There must be medical evidence of a direct causal connection. "The question of causation [is] one for medical testimony, without which a finding for claimant would be based on mere conjecture and speculation and not on substantial evidence." "A claimant must submit medical evidence establishing a *probability* that working conditions caused the disease, although they need not be the sole cause." "Even where the causes of the disease are indeterminate, a single medical opinion relating the disease to the job is sufficient to support a decision for the employee."

*Id.* (citations omitted and emphasis in original). The *Vickers* court emphatically stated, however, that "Chapter 287 does not require a claimant to establish, by a *medical certainty,* that his or her injury was caused by an occupational disease in

order to be eligible for compensation." *Id.* at 295 (emphasis in the original).

In *Vickers,* the Commission denied the claimant's claim for workers' compensation benefits because she did not establish a causal connection between her work cleaning laundry for residents at the Missouri Veterans Home and her contraction of a bacterium, Clostridium difficile (C diff). *Id.* at 289. The claimant asserted that she was exposed to C diff through her work by handling soiled laundry in the Home. *Id.* The evidence established that, during claimant's period of employment, the Home treated approximately four to six patients infected with C diff. *Id.* Although the specific units where the C diff patients resided during their treatment at the Home were unknown, the evidence established that the claimant collected all of the residents' laundry from all four units at the Home. *Id.* The claimant offered the medical testimony of doctor who opined that handling soiled laundry on a daily basis at work put the claimant at a higher risk of contracting C diff and that she more likely than not contracted C diff at work. *Id.* at 293. Conversely, employer's doctor opined that, because no specific documentation existed showing that the claimant was exposed to or came into contact with feces from a C diff infected patient, he could not say with certainty whether the claimant acquired C diff from her work environment. *Id.* at 294.

The Commission concluded that the claimant "failed to produce competent evidence that she handled laundry from any patients infected with C diff or that she contracted C diff from environmental contact at the Home." *Id.* at 295. The Commission found that the claimant needed "to prove that she was in fact exposed to C diff while working for employer and not merely show that she potentially had a greater risk of exposure." *Id.*

This court disagreed and reversed the Commission's decision. In reversing the Commission's decision, the *Vickers* court noted that the claimant had the burden to " 'submit medical evidence establishing a *probability* that working conditions caused the disease.' " *Id.* at 295 (citation omitted and emphasis in the original). The court concluded that the testimony from the claimant's witnesses and medical expert established such a probability. *Id.* The court noted that the claimant's expert "opined that, more likely than not, [the claimant] contracted C diff while working at the Home" and that, under section 287.067, "a single medical expert's opinion may be competent and substantial evidence in support of an award of benefits, even where the causes of the occupational disease are indeterminate." *Id.* The *Vickers* court, therefore, concluded that the claimant put forth sufficient evidence to carry her burden of proving causation. *Id.*

The Commission in our case noted that *Vickers* was factually similar to this case but stated that there was "a fundamental distinction" between the facts in this case and the facts in *Vickers.* In distinguishing *Vickers* from this case, the Commission stated:

> Here, there is no evidence that any person with [hepatitis C] resided or treated in employer's facility while employee worked there. Nor is there evidence that any person with [hepatitis C] provided a blood or tissue sample that was handled in the lab where [Smith] worked. Claimant adduced testimony from [Smith's co-workers] and also provided her own testimony about her time working for employer. None of these witnesses testified that any patient with [hepatitis C] resided in the hospital or received treatment from employer while employee worked there, or that any such patient provided a blood or tissue sam-

ple that was handled in the lab where [Smith] worked.

[Smith] did work for employer for many years (from 1969 until 2006) and so it would certainly *seem* that one or more patients with [hepatitis C] must have [been], at some point, treated at the hospital. But we cannot speculate as to these pivotal facts, nor can we fill in the gaps in the evidence with our own conjecture. As it stands, we are faced with a claim for occupational disease where there is no evidence that the disease was ever present in the workplace. We conclude that, absent such evidence, the case for exposure fails.[8]

The Commission failed to appreciate, however, that "Chapter 287 does not require a claimant to establish, by a medical certainty, that his or her injury was caused by an occupational disease in order to be eligible for compensation." *Id.* at 295 (emphasis omitted). The Commission's decision rests upon the assumption that a claimant must produce evidence of a specific exposure to hepatitis C to establish that the employee's work for employer likely could have infected him with hepatitis C. As the *Vickers* court explained, where a communicable disease is involved, a claimant is "required to demonstrate that she was exposed to and contracted the disease arising out of and in the course of her employment." *Id.* "In order to meet that burden, [a claimant has] to 'submit medical evidence establishing a *probability* that working conditions caused the disease.'" *Id.* (emphasis in the original and citations omitted). Indeed, "a single medical expert's opinion may be competent and substantial evidence in support of an award of benefits, even where the causes of the occupational disease are indeterminate." *Id.*

The claimant in our case offered the testimony of Dr. Parmet to establish the probability that Smith's working conditions caused the hepatitis C. Dr. Parmet testified that Smith's work at Capital Region and his daily exposure to blood put him at a greater risk of contracting hepatitis C. Dr. Parmet further testified that there is a recognizable link between hepatitis C and the distinctive features of Smith's position as a laboratory technologist. Dr. Parmet categorized Smith's job as posing the greatest risk of acquiring hepatitis C due to the high number of needle sticks sustained by those in Smith's profession. According to Dr. Parmet, blood samples taken in hospitals are more likely to contain hepatitis C because of the simple fact that hospitals treat people with illnesses. Further, Dr. Parmet said that the likelihood of hepatitis C infected blood increases for hospitals in urban settings, such as Capital Region located in Jefferson City. Dr. Parmet also explained that the risk factor for contracting hepatitis C for phlebotomists like Smith was especially high before the implementation of OSHA regulations.

Based upon these facts, Dr. Parmet concluded that it was "more likely than not that ... Smith acquired his hepatitis C infection due to his occupational exposure at Capital Region Medical Center, either by a needle stick or by handling blood and body products." Dr. Parmet said that Smith's exposure to needle sticks and Smith's handling blood and body products was the prevailing factor in Smith's developing hepatitis C. Dr. Parmet stated that Smith's work was "clearly the largest risk factor and the most probable source" of his hepatitis C. Further, Dr. Parmet said that, to a reasonable degree of medical certainty, it was "more probable than not that the 1991 recorded symptoms of Stephen Smith

---

8. The emphasis was in the original.

[were] the medically competent producing cause of the hepatitis C."

Such evidence from Dr. Parmet established a probability that Smith's working conditions caused his hepatitis C, and under *Vickers*, such evidence was sufficient to meet the claimant's burden of production on the issue of causation.

The claimant also complains about the Commission's credibility findings concerning the employer's medical expert and the claimant's medical expert. It is well established that the Commission is free to believe or disbelieve any evidence and that we defer to the Commission's credibility determinations. *Clark*, 274 S.W.3d at 617. The Commission found the causation testimony of the employer's medical expert, Dr. Bacon, to be more credible than the claimant's medical expert, Dr. Parmet. Because, however, the Commission employed the wrong standard in determining the claimant's burden of production in regard to causation, it would be premature for us to consider the Commission's credibility determinations at this point. The unique circumstance of this case compels us to remand this case to the Commission for reconsideration in light of the correct standard regarding the claimant's burden of production as to causation.

We, therefore, reverse the Commission's decision denying the claimant's claim for workers' compensation and remand for further proceedings consistent with this opinion.[9]

WITT, P.J., and FISCHER, Sp. J. concur.

---

9. Capital Region asserted in its brief that the Commission erred in not finding that the claimant's claim was barred by the two year statute of limitations of section 287.430, RSMo 2000, because it erroneously determined the date of the injury to be April 20, 2005. Under § 287.063.3, however, the statute of limitations on a claim for occupational disease does not begin to run until it becomes reasonably discoverable and apparent that an injury has been sustained Thus, under this statute, the limitations period "does not begin to run until the disease is reasonably discoverable *and connected to employment.*" *Lawrence v. Anheuser Busch Cos.*, 310 S.W.3d 248, 251 (Mo.App.2010) (citing *Sellers v. Trans World Airlines, Inc.*, 752 S.W.2d 413, 416 (Mo.App.1988), *overruled on other grounds by Hampton*, 121 S.W.3d at 230) (em-

phasis added). "The question as to when a compensable injury becomes reasonably discoverable and apparent is a question of fact to be determined by the Commission." *Lawrence*, 310 S.W.3d at 252. Here, the evidence in the record supported the Commission's determination that Smith's claim did not accrue until 2005, when he was informed by his physician of a possible connection between his hepatitis C and his employment with Capital Region. Further, the fact that the claim ultimately became a claim for death benefits following Smith's death on February 27, 2007, does not trigger a new limitations analysis, since the claim as tried did not alter the nature or cause of the worker's alleged injuries. *Spencer v. Sac Osage Elec. Coop., Inc.*, 302 S.W.3d 792, 803–04 (Mo.App.2010).