

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| STEPHEN SMITH, DECEASED;<br>DOROTHY SMITH,<br><br>         Respondent,<br><br>v.<br><br>CAPITAL REGION MEDICAL<br>CENTER,<br><br>         Appellant. | )<br>)<br>)  **WD77043**<br>)<br>)<br>)  **OPINION FILED:**<br>)  **December 23, 2014**<br>)<br>)<br>)<br>)<br>)<br>) |

**Appeal from the Labor and Industrial Relations Commission**

Before Division Three:  Karen King Mitchell, Presiding Judge, Cynthia L. Martin, Judge
and Gary D. Witt, Judge

Stephen Smith ("Stephen")[1] worked as a medical laboratory technician at Capital

Region Medical Center ("Capital Region") from 1969 until March 2006.  In April 2006,

Stephen filed a claim with the Division of Workers' Compensation alleging that he had

contracted the occupational disease of hepatitis C as a result of occupational exposure.

Stephen was diagnosed with hepatitis in 1991.  He died from complications of the disease

on February 27, 2007.  The cause of death was sepsis, hepatitis C and acute tubular

---

[1] Because we refer to both Mr. and Mrs. Smith in this opinion, we refer to Stephen Smith by his first name
for ease of reference.  No disrespect or familiarity is intended.

neurosis.  Stephen's wife, Dorothy Smith ("Smith") was substituted as a party and proceeded with the claim.  The claim was denied by the Labor Industrial Relations Commission ("Commission") and Smith appealed.  This court reversed the Commission's decision and remanded for "further proceedings consistent with th[e] opinion."  *Smith v. Capital Region Med. Ctr.*, 412 S.W.3d 252, 254 (Mo. App. W.D. 2013) (hereinafter "*Smith I*").

Following remand, the Commission, without taking additional evidence and following its review of all of the evidence, applied the correct legal standard and issued its decision awarding Smith burial expenses of $2,897.58, temporary total disability expenses of $9,848.83 and weekly death benefits of $675.90.  Capital Region now appeals.[2]  For reasons explained more fully below, we affirm.

## FACTS AND PROCEDURAL HISTORY[3]

Stephen worked for Capital Region from 1969 until March 2006 as a laboratory technologist.  In this position, Stephen drew blood from patients, and worked with blood, human tissue and blood products every day.  Stephen worked for Capital Region for a number of years before safety measures to protect people working with blood products were put into effect.[4]  For several years, Stephen and his co-workers did not wear gloves

---

[2] Seven large health care employers or associations filed a combined *Amici Curiae* brief.  These are identified as Mo. Self-Insurers Association, Mo. Hospital Association, BJC Healthcare, HCA Midwest Health System, St. Luke's Health System, SSM Health Care and National Federation of Independent Business.  To the extent arguments are made by the *amici* that are divergent from Capital Region's, they are addressed herein and identified as such.

[3] We borrow much of the statement of the facts and medical evidence from *Smith I*, 412 S.W.3d at 254, without further attribution.  We also rely upon the Commission's findings of fact contained in its final award.

[4] None of the witnesses who testified at the hearing were able to pinpoint exactly when the safety changes occurred but suggested that these changes occurred sometime in the 1980s or 1990s.  According to Smith's expert, Dr. Allen Parmet, OSHA standards now require medical personnel to wear gloves and wear eye or face shields when

while working with blood or tissue. Moreover, for many years, Stephen and his co-workers prepared blood slides by use of a "pipette," which is essentially a narrow glass straw. The lab technician would place one end of the pipette into a tube of blood and then place his or her mouth on the other end of the pipette to suction some of the blood into the pipette, creating the substantial possibility of accidentally suctioning blood into his/her mouth. For several years, Stephen and his co-workers were not provided with face shields. As a result, the possibility existed of blood being splattered into Stephen's face, particularly when blood was being centrifuged. Further, the possibility of a needle stick or a blood coming into contact with a cut or sore on Stephen's hands was present during Stephen's entire tenure with Capital Region, especially before gloves were worn when handling blood or tissue. Stephen never reported a needle stick to his employer, but his employer also did not require the reporting of such incidents until sometime in the 1980s or 1990s.

Smith, who was a registered nurse and also worked for Capital Region, and Stephen's co-workers all testified that they came into contact with blood on their skin regularly. Stephen's co-workers performed the same job duties as Stephen and said that they had gotten blood in their mouths while pipetting. One of Stephen's co-workers and Smith also said that they had experienced needle sticks during their careers. Smith said that she had experienced numerous needle sticks and had blood of patients or bodily fluids of patients upon her person several times a week. Smith also testified that she had

handling bodily fluids. He also said that needles are now "single injectable needle[s]" with "automatic cover[s]." Dr. Parmet testified that medical personnel no longer recap needles.

3

observed cuts or bandages on Stephen's fingers. Stephen's co-workers and Smith on occasions noticed spots of blood on Stephen's protective lab coat or clothing, but none of them testified that they ever personally witnessed blood on Stephen's face, witnessed him ingest blood by pipetting, or witnessed him suffer a needle stick.

Smith testified that Stephen was wounded with a shotgun in a hunting accident in 1970. As a result of the gunshot wound, Stephen underwent surgery and was given a blood transfusion, with six units of blood. Other than the blood transfusion from this surgery, Smith testified that Stephen did not engage in any type of activities away from work where he could come into contact with other humans' bodily fluids. Stephen did not use intravenous drugs; he did not have tattoos; and he was not a member of the military, all of which have been shown to increase the risk of contracting hepatitis C.

Stephen was first given the diagnosis of hepatitis in 1991, when he was hospitalized for abdominal pain and blood tests revealed elevated liver enzymes. The hepatitis was later typed as hepatitis C.[5] On April 20, 2005, Smith brought Stephen to the emergency room because he was confused and lethargic.[6] At that time, Stephen was diagnosed with hepatic encephalopathy. His treating physician, Dr. Arthur Dick, first alerted Stephen to the possibility that his hepatitis C may have been contracted from his work at Capital Region on December 5, 2005. Stephen continued to try to work for Capital Region after this time, but, due to health problems associated with his disease, Stephen was unable to work after March 2006. Thereafter, Stephen filed his claim for

---

[5] There was no way to test for hepatitis C prior to 1991.

[6] Neither party disputes the Commission's finding that April 20, 2005, is the date of injury for purposes of Smith's claim. Therefore, the August 28, 2005 amendments and subsequent changes to the Workers' Compensation Law are inapplicable in this matter.

4

workers' compensation. On February 27, 2007, while his claim was pending, Stephen died. His cause of death was sepsis, hepatitis C, and acute tubular neurosis, all complications of his disease. After Stephen's death, Smith was substituted as a party to the claim. While there is no dispute that hepatitis C caused Stephen's death, how and when he contracted the disease is disputed.

At the hearing, Smith and Capital Region presented competing expert medical evidence on the issue of causation of Stephen's hepatitis C. Smith presented the testimony of Dr. Allen Parmet through deposition, who opined that Stephen's work for Capital Region was more likely than not the cause of him contracting hepatitis C and that his work was the prevailing factor in causing him to develop hepatitis C. According to Dr. Parmet, Stephen likely contracted the disease by needle stick or by handling blood and bodily tissue. Dr. Parmet noted that Stephen worked for Capital Region for many years handling blood and body products before the health care industry began to pay attention in the mid–1990s to the safety risks posed by blood-borne pathogens. Dr. Parmet identified the risk of blood splashing into Stephen's eyes, nose, and mouth and opined that needle sticks were a very significant risk factor for phlebotomists and laboratory personnel and occurred quite frequently prior to the institution of OSHA safety standards. Indeed, Dr. Parmet found that Stephen's job placed him in the highest risk group for hepatitis C infection. Dr. Parmet stated that Stephen reported that he suffered multiple needle sticks while working. Dr. Parmet further testified that fifteen percent of patients coming into a hospital in an urban setting have hepatitis C and one percent of the

5

total population has hepatitis C. There was testimony that Capital Region was located in what is considered an urban setting.

Dr. Parmet acknowledged that Stephen's receipt of a blood transfusion in 1970 was also a risk factor for contracting hepatitis C. However, he ultimately opined that Stephen's work for Capital Region and Stephen's daily exposure to blood and body products for many years was the largest risk factor and the most probable source of Stephen's hepatitis C, either through a needle stick or his handling of blood and body products. Dr. Parmet opined that the chances of Stephen contracting the disease through the blood transfusion in 1970 was around six percent, but it was his opinion, based on the extended length of time after the transfusion before Stephen exhibited symptoms of the disease, that the transfusion was not the cause of Stephen contracting the disease.

When asked whether Stephen's blood transfusion in 1970 either caused or contributed to cause his hepatitis C, Dr. Parmet stated:

> Based on [the] statistics, as well as [Stephen's] own medical history absent any symptoms of cirrhosis, liver disease prior [to] the 1990s, no evidence of development of cirrhosis until after 2000, it seems highly improbable that the blood transfusion of [1970][7] would have been causal, first of all, because the absolute risk was 6 percent and so then half of all people who have hepatitis C should have developed cirrhosis within 15 years or about 1985. And yet [Stephen] doesn't develop cirrhosis for 30 years, which would put him down in the very few percentage of people who do develop cirrhosis with that long a latency.

With regard to the period of time after a person is exposed to hepatitis C and the time a patient can predictably become symptomatic, Dr. Parmet testified that there is an

---

[7] In his testimony, Dr. Parmet misspoke stating that it was "improbable that the blood transfusion of *1990* would have been causal[.]" The evidence, however, clearly established that Smith received the blood transfusion in 1970, a fact that is not in dispute.

average incubation period of six weeks between the initial exposure and the development of acute hepatitis syndrome. That syndrome includes flu-like symptoms of general aches, pains, malaise, fevers but rarely jaundice.[8] Dr. Parmet stated, however, that not everyone who gets the infection develops the acute syndrome; rather, half to two-thirds of people are completely asymptomatic and never know when the initial infection was acquired. Following this incubation period, there is a latency period when the hepatitis C virus is slowly growing, replicating, and damaging the liver. According to Dr. Parmet, the minimum time from onset of the infection to onset of actual liver disease is seven years, with fifteen years being the average.

On cross-examination, however, Dr. Parmet testified that the website of his current employer, St. Luke's Hospital, indicated that a person could live with hepatitis C for fifteen years or longer before it is even diagnosed. Dr. Parmet explained the average time from infection with hepatitis C to when a person becomes symptomatic is fifteen years. So according to Dr. Parmet, half of the people with hepatitis C will become symptomatic before fifteen years, and half of the people will go at least fifteen years before being symptomatic.

Dr. Parmet concluded that it was "more likely than not that . . . Smith acquired his hepatitis C infection due to his occupational exposure at Capital Region Medical Center, either by a needle stick or by handling blood and body products." Dr. Parmet testified that the prevailing factor in Stephen's developing hepatitis C was his exposure to needle

---

[8] Dr. Parmet opined that because Stephen's 1991 hospitalization records noted some of these symptoms, he believed Stephen had been initially exposed to the disease approximately six weeks prior. The Commission, however, found this timeline for initial exposure to lack credibility, both in its original decision and its later 2013 Final Award.

7

sticks and handling of blood and body products. Dr. Parmet stated that Stephen's work was "clearly the largest risk factor and the most probable source" of his hepatitis C. Further, Dr. Parmet said that, to a reasonable degree of medical certainty, it was "more probable than not that the 1991 recorded symptoms of Stephen Smith [were] the medically competent producing cause of the hepatitis C." Dr. Parmet further opined that Stephen's death was caused by liver failure as a result of hepatitis C.

Capital Region's expert, Dr. Bruce Bacon, did not testify but his opinions were admitted through a report dated January 7, 2009. Dr. Bacon reviewed Stephen's medical records before forming his opinions, which were set forth in the report. Dr. Bacon opined that Stephen likely contracted hepatitis C when he received the 1970 blood transfusion. According to Dr. Bacon, it is well known that blood transfusions prior to 1992 were frequently contaminated with hepatitis C. Dr. Bacon said that seven to ten percent of individuals who received blood transfusions prior to 1992 contracted hepatitis C from the blood transfusion.[9] Dr. Bacon noted that laboratory tests performed on Stephen in 1990 showed mildly elevated liver enzymes and that a liver scan done at the same time showed diffuse hepatocellular dysfunction. Further, Dr. Bacon noted laboratory tests performed when Stephen was hospitalized in 1991 showed "a low albumin level of 3.0 with a total bilirubin level that was increased at 3.2." According to Dr. Bacon, these findings along with the elevated liver enzymes are consistent with chronic liver disease.

---

[9] The Commission noted in its factual findings in the final award that if it accepted this opinion from Capital Region's expert, it would have to "infer that there is a 90 to 93% chance that [Stephen] did *not* contract [hepatitis C] from the 1970 blood transfusion." (Emphasis in original.)

Further, Dr. Bacon indicated that there was "no evidence that [Stephen's] illness in 1991-1992 was an acute infection with hepatitis C." Rather, Dr. Bacon found that the findings in 1991-1992 were consistent with chronic hepatitis C and would be consistent with someone having been exposed at the time of the blood transfusion twenty years earlier. According to Dr. Bacon, the average time for progression from exposure to hepatitis C to cirrhosis is usually twenty to thirty years. Dr. Bacon, therefore, concluded that in Stephen's case, the "likely scenario" was that Stephen "contracted hepatitis C at the time of blood transfusion in 1970, had developed chronic liver disease by the time of his admission to the [hospital] in 1991 and then developed complications that ultimately caused his death in 2006." Dr. Bacon testified that he offered this opinion "to a reasonable degree of medical certainty." Dr. Bacon further testified that because there was no documentation that there were ever any needle sticks or blood exposures during [Stephen's] employment, it [was] hard to implicate this as a possible cause of his infection with hepatitis C."[10] However, Dr. Bacon did not rule out Stephen's work as a risk factor for the disease. Dr. Bacon's opinions appear to be based on the incorrect legal standard of requiring a specific event establishing exposure to the disease must be shown before the work can be found to be the cause of the disease.

As a precursor to the appeal in *Smith I,* on November 30, 2010, an Administrative Law Judge ("ALJ") held a hearing on Smith's claims. The ALJ determined that Stephen did not sustain an accident or an occupational disease arising out of and in the course of

---

[10] Dr. Bacon's opinions were based on the assumption that because there were no records of needle sticks, none occurred. However, this testimony overlooks the uncontroverted testimony that Capital Region did not require employees to report needle sticks until sometime in the 1990s.

9

his employment with Capital Region. Smith appealed this decision to the Commission, which affirmed and adopted the ALJ's decision denying compensation. The Commission found that Smith failed to meet her burden of proof that Stephen sustained an occupational disease arising out of and in the course of his employment with Capital Region. The Commission concluded that Smith produced no direct evidence that Stephen was exposed to hepatitis C in the workplace. Smith appealed.

On appeal, we determined that the Commission erred in resting "upon the assumption that a claimant must produce evidence of a specific exposure to hepatitis C to establish that the employee's work for employer likely could have infected him with hepatitis C." *Smith I*, 412 S.W.3d at 261. The Commission, in its first award, relied upon the fact that Stephen produced no evidence of an actual patient with hepatitis C being treated at the hospital where he worked in the relevant time frame or proof that Stephen actually handled blood or a tissue sample from an infected person.[11] *Id.* at 260-61. We held that under Chapter 287,[12] a claimant must submit medical evidence establishing a probability that a working condition caused the disease even though it may not be the sole cause. *Id.* "To prove causation it is sufficient to show a recognizable link between the disease and some distinctive feature of the job which is common to all jobs of that sort." *Id.* at 259 (internal citations and quotation marks omitted). "And there must be

_____

[11] This is a potentially impossible burden because there was no test to confirm the presence of hepatitis C in blood until approximately 1991, over twenty years after Stephen began working for Capital Region. Moreover, OSHA had not yet established safety precautions for handling blood and tissue. Thus, for twenty years of his employment, Stephen and his co-workers were not even required to report needle sticks. *See supra,* notes 3, 5.

[12] All statutory references are to RSMo 2000 cumulative as supplemented unless otherwise indicated.

10

evidence of a direct causal connection between the conditions under which the work is performed and the occupational disease." *Id.*

When analyzed under the proper standard, we held that the evidence established a probability that Stephen's working conditions caused his disease and such evidence was sufficient to meet Smith's burden of production on the issue of a causal connection between the conditions of employment and the occupational disease. We remanded the matter for the Commission to reconsider the evidence under the correct standard of causation.

The Commission, following our mandate, did not receive additional evidence from the parties but fully reviewed all of the evidence that was adduced in the prior hearing. Following its detailed review of the evidence, the Commission reconsidered some of its prior credibility findings made in its first award. After a careful analysis of the expert medical testimony, the Commission found Dr. Parmet's testimony more relevant and persuasive than Dr. Bacon's testimony. Based on all of the evidence, it concluded:

> [T]hat [Stephen]'s work involving decades of daily exposure to blood and body products involved an exposure to HCV greater than or different than that which affects the public generally. We conclude that there is a recognizable link between HCV and needle sticks or blood splashes which are distinctive feature of [Stephen's] job that are common to all jobs of that type. We conclude that there is a direct causal connection between the condition under which [Stephen] performed his work and the occupational disease of HCV, and that the employment was a substantial factor in causing [Stephen] to suffer the occupational disease of HCV.

The Commission awarded benefits pursuant to the Workers' Compensation Law. Capital Region now appeals.

11

## ANALYSIS

In its sole point, Capital Region argues that the Commission erred because its award following remand was against the weight of the evidence in that Smith did not prove by substantial evidence that Stephen's disease arose out of and in the course of his employment with Capital Region. It further alleges that the Commission "ignored precedent and misunderstood" our holding in *Smith I* to mean that the claimant did not have to provide evidence that hepatitis C was in fact present in the workplace. Last, it argues that the Commission erred in accepting Smith's expert's opinion regarding causation and rejecting Capital Region's expert's opinion regarding causation.[13]

Smith responds that because Capital Region brings no new issue on appeal, the law of the case doctrine governs and the Commission's final award should be affirmed.

### Standard of Review

We review the whole record to determine whether there is sufficient competent and substantial evidence to support an award under the Workers' Compensation Law or if the award is contrary to the overwhelming weight of the evidence. *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003). This court may modify, reverse, remand for rehearing, or set aside the award of the Commission only if it determines that the Commission acted in excess of its powers, that the award was procured by fraud, that the facts found by the Commission do not support the award, or

---

[13] We note that in Capital Region's Point Relied On, it raises arguments that the award "was against the overwhelming weight of the evidence" as well as that "there was no evidence in the record of any HCV in the workplace during Smith's employment." These are two distinct arguments, thereby rendering this point multifarious. Moreover, the two assertions cannot co-exist because, as our Supreme Court noted in *Ivie v. Smith*, a "claim that the judgment is against the weight of the evidence presupposes that there is sufficient evidence to support the judgment." *Ivie*, 439 S.W.3d 189, 205 (Mo. banc 2014) (citing *In re J.A.R. v. D.G.R.,* 426 S.W.3d 624, 630 (Mo. banc 2014)).

12

that there was not sufficient competent evidence in the record to warrant making the award. § 287.495.1. We defer to the Commission's factual findings and recognize that it is the Commission's function to determine the credibility of witnesses and evidence. *Hornbeck v. Spectra Painting, Inc.*, 370 S.W.3d 624, 629 (Mo. banc 2012) (citation omitted).

## Discussion

### I. Law of the Case Doctrine

In our review of the record, we must first determine whether the issues raised in this second appeal between the same parties is barred by the law of the case doctrine. The law of the case doctrine provides that a previous holding in a case constitutes the law of that case and precludes re-litigation of issues previously decided on remand and subsequent appeal. *Walton v. City of Berkeley*, 223 S.W.3d 126, 128-29 (Mo. banc 2007) (citations omitted). The doctrine governs successive adjudications involving the same issues and facts. *Id.* (citation omitted). "Generally, the decision of an appellate court is the law of the case for all points presented and decided, as well as for matters that arose prior to the first adjudication and might have been raised in the prior appeal but were not." *Id.* (citation omitted). "[T]he doctrine of the law of the case governs successive appeals involving substantially the same issues and facts, and applies appellate decisions to later proceedings in that case." *Am. Standard Ins. Co. of Wis. v. Stinson*, 404 S.W.3d 303, 314 (Mo. App. E.D. 2012) (citing *Williams v. Kimes,* 25 S.W.3d 150, 153 (Mo. banc 2000)).

"The doctrine of law of the case, however, is not absolute." *State ex rel. Alma Tel. Co. v. Pub. Serv. Comm'n*, 40 S.W.3d 381, 388 (Mo. App. W.D. 2001) (citations omitted). Rather, the doctrine is a rule of policy and convenience; a concept that involves discretion. *Id.* (citation omitted). We have discretion to refuse to apply the doctrine where the first decision was based on a mistaken fact or resulted in manifest injustice or where a change in the law intervened between the appeals. *Id.* (citations omitted). Further, where the issues or evidence on remand are substantially different from those vital to the first adjudication and judgment, the doctrine may not apply. *Id.* (citations omitted).

Here, in its sole point, Capital Region argues that the Commission erred because its award was against the weight of the evidence in that Smith did not prove by substantial evidence that his disease arose out of and in the course of his employment with Capital Region. No new evidence was presented on remand, but pursuant to our mandate, the Commission thoroughly reviewed the evidence presented through the proper lens as set forth in our prior opinion, *Smith I*. Capital Region does not claim that the Commission's award was based on a mistake of fact, or resulted in a manifest injustice, or that a change in the law requires a different result; neither was any new evidence presented. *Jenkins v. Jenkins*, 406 S.W.3d 919, 924-25 (Mo. App. W.D. 2013) (citations omitted). Thus, none of the cited exceptions to the doctrine applies here. *Id.*

However, the Commission, in performing its duties pursuant to our mandate, "carefully and thoroughly" reviewed the expert medical evidence in this matter and reconsidered some of its prior credibility determinations regarding the testimony of

14

certain witnesses, particularly the parties' experts. A review of our holding in *Smith I* establishes that we have already addressed and resolved most of Capital Region's arguments and the law of the case controls those issues. The sole issue properly before us today is whether the Commission's final award following remand was against the weight of the evidence.

## II. Application of Our Holding in *Smith I* to this Appeal

In *Smith I*, we held that Smith was not required to present evidence of specific exposure to an occupational disease in the workplace; rather, she was required to submit medical evidence establishing a *probability* that working conditions caused the disease. We further found that the evidence presented in this case was sufficient to have met the burden of production on the issue of causation.[14] We stated the following:

> The Commission failed to appreciate, however, that Chapter 287 does not require a claimant to establish, by a medical certainty, that his or her injury was caused by an occupational disease in order to be eligible for compensation. The Commission's decision rests upon the assumption that a claimant must produce evidence of a specific exposure to hepatitis C to establish that the employee's work for employer likely could have infected him with hepatitis C. As the *Vickers* court explained, where a communicable disease is involved, a claimant is required to demonstrate that she was exposed to and contracted the disease arising out of and in the course of her employment. In order to meet that burden, [a claimant has] to submit medical evidence establishing a *probability* that working conditions caused the disease. Indeed, a single medical expert's opinion may be

---

[14] We note that the *amici* brief misinterprets our holding. In their brief, the *amici* argue that should the Commission's award stand, it will "adversely impact these employers by expanding their workers' compensation occupational disease exposure far beyond its current parameter." Under the *amici*'s interpretation of current law, "an employer only has exposure for an occupational disease claim where an employee can prove the probability that the conditions of the employment caused the presence in the workplace of an actual hazard or risk of contracting the disease, not just the possibility that such a hazard or risk exists." Our holding does not alter the law to say that a claimant need only prove a "possibility" that the risk existed in the workplace; rather, we followed precedent holding that a claimant must prove through expert medical testimony the *probability* that the workplace contained a risk of exposure.

competent and substantial evidence in support of an award of benefits, even where the causes of the occupational disease are indeterminate.

*Smith I*, 412 S.W.3d at 261 (citations and quotation marks omitted).

This is consistent with the statutory guidelines regarding exposure to occupational disease found in Chapter 287. Section 287.063.1[15] states:

An employee shall be conclusively deemed to have been exposed to the hazards of an occupational disease when for any length of time, however short, *he is employed in an occupation or process in which the hazard of the disease exists*, subject to the provisions relating to occupational disease due to repetitive motion, as is set forth in subsection 8 of section 287.067.

(Emphasis added.)

"Absent a definition in the statute, the plain and ordinary meaning is derived from the dictionary." *Circuit City Stores, Inc. v. Dir. of Revenue*, 438 S.W.3d 397, 400 (Mo. banc 2014). The definition of "hazard" is "a danger; peril; a possible source of peril, danger, duress or difficulty; a condition that tends to create or increase the possibility of loss." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1041 (1993). Notably, the legislature did not use the phrase "where the disease exists" though it could have. We presume the legislature intended every word to have meaning. *Lake v. Levy*, 390 S.W.3d 885, 892 (Mo. App. W.D. 2013) (citation omitted). In other words, the statute addresses employment where the *risk* of a disease exists.

In *Smith 1*, we held that the "evidence from Dr. Parmet established a probability that Smith's working conditions caused his hepatitis C, and under *Vickers*, such evidence

---

[15] All statutory references are to RSMo 2000 cumulative as supplemented through the 2004 cumulative supplement unless otherwise indicated. Section 287.063 was originally enacted in 1959. It underwent amendments in 1974, 1983, 1993 and 2005; however, subsection 287.063.1 has remained unchanged since 1993 thus it applies to Stephen's injury date of April 20, 2005.

16

was sufficient to meet the claimant's burden of production on the issue of causation." 412 S.W.3d at 262. Upon remand, the Commission reviewed the entire record and re-weighed the evidence based upon the standards set forth in *Smith I*. It then determined that Smith's credible evidence was sufficient to meet the burden of proof as to causation.

Regardless, Capital Region attempts to carve out a "new" issue by stating that our previous opinion did not address whether Smith "met her burden of persuasion." Capital Region argues that we "made no finding . . . regarding whether claimant's medical expert testimony, consisting of a 'probability' of exposure based on [Stephen's] job as a medical technician, absent any evidence to [hepatitis C] in the workplace, constituted substantial evidence sufficient to meet her required burden of persuasion to support an award."

As we pointed out in *Smith I*, the burden of proof consists of two parts: the burden of production and the burden of persuasion. 412 S.W.3d at 259. The burden of production is simply the initial burden of having *some* evidence to support each element of the claim, so as to overcome a summary disposition such as a directed verdict or summary judgment. On the other hand, "[t]he burden of persuasion is a party's duty to convince the fact-finder to view the facts in a way that favors that party." *M.A.H. v. Mo. Dep't of Social Serv.*, No. ED100636, 2014 WL 4067208, at *5 (Mo. App. E.D. Aug. 19, 2014) (citations omitted). Indeed, the burden of persuasion is met when, after a careful consideration and weighing of both parties' evidence, a fact-finder decides in favor of the party who carried the burden of proof on those issues.

Our holding in *Smith I* corrected the Commission's misinterpretation of precedent and applicable statutes with regard to its finding that in order to establish the element of

17

causation Smith was required to produce direct evidence of specific exposure to hepatitis C in the workplace. We found as a matter of law that the evidence presented by Smith was sufficient to meet the burden of production on the issue of causation. Our general remand to the Commission directed them to review the evidence and determine whether Smith met the burden of proof on all of the issues, consistent with the legal parameters set forth in our opinion.[16] It is the duty of the fact finder, not a court of review, to determine credibility of witnesses and evidence and determine which testimony or evidence is more persuasive and which is less so.

As we noted in *Smith I*, "[i]n order to meet that burden, a claimant has to submit medical evidence establishing a probability that working conditions caused the disease." *Smith I*, 412 S.W.3d at 261 (citing *Vickers v. Mo. Dep't of Pub. Safety*, 283 S.W.3d 283 S.W.3d 287, 295). "Indeed, a single medical expert's opinion may be competent and substantial evidence in support of an award of benefits, even where the causes of the occupational disease are indeterminate." *Id.* In other words, Dr. Parmet's expert medical testimony was enough to establish the probability that Stephen was exposed to hepatitis C while employed as a lab technician at Capital Region.

Upon remand, the Commission found Dr. Parmet's medical opinions more persuasive than Dr. Bacon's opinions based upon a thorough review of all of the

_____

[16] There are two types of remands: 1) a general remand that does not provide specific direction and that leaves all issues open to consideration in the new trial; and 2) a remand with directions that requires the trial court to enter a judgment in conformity with the mandate. *Abt v. Miss. Lime Co.*, 420 S.W.3d 689, 697 (Mo. App. E.D. 2014) (citations omitted). A general remand cannot be read in isolation; rather, it directs the lower court to proceed in accordance with the holdings of the appellate court as set forth in its opinion as the law of the case. *Id.* On remand, the proceedings should accord with both the mandate and the result contemplated in the opinion. *Id.* "The opinion is part of the mandate and must be used to interpret the mandate itself." *Id.* (citation omitted).

18

evidence. *Smith I* required the Commission to review all of the evidence in light of the correct legal standard and determine whether Smith's evidence was more persuasive than Capital Region's. It is clear from the Commission's final award that it did exactly what we required of it in our mandate. After conducting a review of the evidence and applying the proper legal standard, the Commission found Smith's evidence to be more credible on the issues at hand and concluded that she had, in fact, met her burden of proof.

The essence of Capital Region's argument is that it desires to re-argue our previous opinion in *Smith I* regarding what a claimant is required to prove in order to establish a claim of this nature. However, because that decision is not subject to further review, Capital Region attempts to frame the argument as a disagreement with the Commission's determination on remand as to the burden of persuasion. Capital Region and the *amici* argue that a determination that a claimant was exposed to an occupational disease requires specific evidence that the disease existed in the workplace. However, as noted above, the issue of the legal standard applied in determining exposure (both the presence of the disease and the mechanism of exposure) to an occupational disease was resolved by our holding in *Smith I*; therefore, the doctrine of the law of the case applies as to proof of exposure.

## CONCLUSION

In sum, our opinion in *Smith I* found that Smith met her burden of producing substantial evidence that Stephen's work conditions created the probability of a risk of exposure to hepatitis C. On remand, the Commission determined that it was persuaded by Smith's evidence and found that she had met her burden of proof as to all elements of

19

her cause of action. In this second appeal, Capital Region asks us to re-evaluate the same evidence. Because we have already determined that Smith met her burden of establishing her cause of action, the doctrine of the law of the case applies and there is nothing new for us to consider. To the extent that Capital Region claims to be challenging the sufficiency of the evidence, the evidence as set forth above, which was found credible by the Commission, is sufficient to establish Smith's claim. We therefore affirm the judgment of the Commission.

_____
Gary D. Witt, Judge

All concur