IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 5, 2019

## JAKEIL MALIK WALLER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
No. C-17-150          Donald H. Allen, Judge

———————————————————

### No. W2018-01235-CCA-R3-PC

———————————————————

The Petitioner, Jakeil Malik Waller, appeals the post-conviction court's denial of his petition for post-conviction relief. The Petitioner was convicted of second degree murder and reckless endangerment and received an effective sentence of twenty-seven years. On appeal, the Petitioner contends that he received the ineffective assistance of counsel. After a review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the Appellant, Jakeil Malik Waller.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jody Pickens, District Attorney General; and Al Earls and Aaron Chaplin, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL BACKGROUND

**Trial**

This appeal arises from the Petitioner's convictions of second degree murder and reckless endangerment. The Petitioner previously filed a direct appeal to this court, and this court denied the Petitioner relief. *See State v. Jakeil Malik Waller*, No. W2015-

02361-CCA-R3-CD, 2016 WL 7242816 (Tenn. Crim. App. Dec. 15, 2016), *perm. app. denied* (Tenn. Mar. 9, 2017). This court summarized the evidence presented at trial as follows:

> This case arises out of a fight between two young men, which ended when the [Petitioner] and his brother fired multiple shots into a crowd of people who were watching the fight—killing Shomari Peterson and injuring Thomas Reid, Jr. At trial, Jessica Spencer testified that she was living at Parkway East Apartments in Jackson on July 27, 2014. On that day, Ms. Spencer saw a crowd gathering in a grassy area behind one of the apartment buildings, and she heard someone say, "[T]hey [sic] fixing to fight[.]" Ms. Spencer went to where the crowd had gathered and began recording the scene with her cell phone. She explained that a fight broke out between Tristan Cook and another young man. According to Ms. Spencer, the other man "was whupping Tristan," and several people stepped in to help Tristan and break up the fight. Then, Ms. Spencer's boyfriend, Quantavious Anderson, started to fight with the man who had beaten up Tristan. At that time, Ms. Spencer saw the [Petitioner] come from behind one of the nearby buildings to stand at the edge of the crowd. Ms. Spencer recalled that the [Petitioner] was wearing gray and black clothing and a hat. She noticed that the [Petitioner] was "fidget[ing]" with something and then pulled out a black handgun and shot into the crowd of people. Ms. Spencer stated that she saw the [Petitioner] shoot the gun one time, but she heard additional gunshots as she ran from the scene. She said that she saw someone with a bat but did not see anyone else with a gun.
>
> Ms. Spencer testified that, several days after the shooting, she dropped her cell phone and cracked the screen. She then sold her phone at a machine at a mall. Ms. Spencer testified that, before her phone was damaged, she showed the cell phone video of the incident to the mother of one of the shooting victims. She explained that she did not initially turn it over to police because she did not want to get involved. However, an investigator with the Jackson Police Department ("JPD") subsequently asked her about the cell phone video and the location of her phone. Ms. Spencer identified the [Petitioner] in the video. She then reviewed several screenshots from the cell phone video. She identified the [Petitioner] in one of the screenshots and stated that it showed the [Petitioner] holding up a gun and "getting ready to shoot[.]"
>
> Jamarion Snipes testified that, on the day of the shooting, he and his best friend, Shomari Peterson, were at a restaurant when Mr. Peterson

- 2 -

received a phone call. Mr. Peterson said that they needed to go back to Parkway East because some people were "fixing to jump on Tristan[.]" Jamarion explained that Tristan had intervened in a fight between his girlfriend and another woman a few days earlier and the other woman's boyfriend, Martel Majors, wanted to fight Tristan. Jamarion said that he and Mr. Peterson returned to the apartment complex around 5:00 p.m. As they were walking through the parking lot, Jamarion noticed four men sitting on the hood of a car. He knew two of the men—the [Petitioner] and the [Petitioner]'s brother, Jernigal Blackwell. He recalled that the [Petitioner] had on a backwards ball cap and gray sweat pants and that Mr. Blackwell had on orange shorts. Jamarion testified that, as he and Mr. Peterson approached Tristan, he heard someone say that they needed to wait until Tristan's uncle arrived. While they waited for Tristan's uncle, about thirty to forty people gathered outside. Eventually, Tristan and Mr. Majors began arguing and then started to fight.

Jamarion recalled that, at the beginning of the fight, the [Petitioner] announced, "I'm going to sit back in the breezeway and make sure nobody just jump[s] in. You ain't go[t] to worry about nothing." At that time, he noticed Mr. Blackwell reaching in his pockets. Mr. Peterson pointed a baseball bat at Mr. Blackwell and said, "Keep your hands out [of] your pocket. You don't need to do that." Jamarion stated that, when another man jumped into the fight, he heard gunshots. When the shooting began, Jamarion and Mr. Peterson "tried to take off running," but Mr. Peterson was hit with a bullet and fell down. Two men picked up Mr. Peterson and carried him into a nearby apartment. Jamarion testified that he looked back when Mr. Peterson fell and saw the [Petitioner] and Mr. Blackwell shooting at them. He estimated that Mr. Peterson was five or six feet away from the [Petitioner] and Mr. Blackwell when they began shooting. He stated that he heard about twenty gunshots in total. After the shooting, Jamarion learned that Mr. Peterson had been shot. He stated that he went to the apartment where Mr. Peterson was located and that Mr. Peterson was "in the house bleeding to death and then my cousin took off his shirt and wiped his face." Mr. Peterson said, "Please don't let me die. Please don't let me die[.]"

Jamarion recalled that, when the police arrived on the scene, the [Petitioner] and Mr. Blackwell avoided the officers and left the apartment complex. Jamarion testified that Mr. Blackwell fired the first shot but that he also saw the [Petitioner] shooting from the side of the building. He stated that he knew Mr. Blackwell had a gun before the shooting because it had an extended clip that was "hanging out of his shorts[.]"

- 3 -

On cross-examination, Jamarion said that Tristan initially did not want to fight and that someone called Tristan's uncle over "just to make him fight [.]" Jamarion recalled that Tristan's uncle arrived with four other people before the fight. Jamarion said that Mr. Blackwell fired the first shot and that he believed the first shot hit Mr. Peterson. He stated that Mr. Peterson fell down before the [Petitioner] fired a shot. He said that Mr. Peterson was attempting to run away when he was shot. He stated that, after the [Petitioner] started shooting, "They was [sic] all shooting back at each other."

Averyion Cook testified that he was at Parkway East with his brother, Tristan, when a group of people began gathering in a parking lot. He recalled that the [Petitioner] and Mr. Blackwell were standing with the group of people with "their hands in their pocket[s] the whole time." Averyion explained that the crowd was there to watch Tristan fight Mr. Majors because the day prior the mother of Tristan's child got into a fight with Mr. Majors['] girlfriend and Tristan stepped in.

Averyion recalled that the crowd began to get "rowdy" after the fight was over. At that time, he noticed the [Petitioner] and Mr. Blackwell backing away from the crowd. As Mr. Majors ran behind the apartment building, Averyion heard gunshots. Averyion stated that the [Petitioner] shot up into the air one time and, at first, no one moved. Then Mr. Blackwell started shooting, and "everybody started running." As he fled, Averyion saw the [Petitioner] and Mr. Blackwell shooting towards the crowd. Although he did not see Mr. Peterson get shot, Averyion saw Mr. Peterson lying on the ground holding his chest. Averyion identified the [Petitioner] in the cell phone video of the fight and described the [Petitioner]'s clothing as a dark gray shirt and gray jogging pants. He also identified Mr. Blackwell, who was wearing orange shorts in the video.

On cross-examination, Averyion testified that he did not see his and Tristan's uncle at the fight. Averyion further testified that he did not see anyone with a baseball bat at the scene. He agreed, however, that the cell phone video showed a man in the crowd holding a bat. Averyion recalled hearing "[a] bunch" of shots, and he stated that he only saw the [Petitioner] and Mr. Blackwell firing a weapon.

Jacobe Snipes testified that he was at Parkway East at the time of the shooting. Jacobe explained that he saw the [Petitioner] and Mr. Blackwell sitting on the hood of a car before the fight. During the fight, Jacobe

- 4 -

noticed that "[t]he dude in the orange [shorts] kept like touching his pocket[.]" He realized that the man had a gun in his pocket. He stated that, when the fight stopped, the [Petitioner] and Mr. Blackwell started shooting towards the crowd. Jacobe said that Mr. Blackwell fired first and that both men were standing between two apartment buildings. As he ran from the area, Jacobe heard several more gunshots. Jacobe testified that he only saw the [Petitioner] and Mr. Blackwell firing a gun and that he did not see anyone else with a gun that day. Jacobe recalled that he helped Mr. Peterson to a nearby apartment after Mr. Peterson was shot. Once inside, Mr. Peterson fell to the floor in the kitchen and began to cough up blood.

On cross-examination, Jacobe explained that he was at the gates of the apartment complex when he heard there was going to be a fight. He saw a crowd of people and went over to the group right before the fight began. Jacobe could tell that the [Petitioner] and Mr. Blackwell had guns because their "pocket[s] [were] like shaped in a gun[.]" Jacobe said that he did not see anyone with a baseball bat. He stated that he first saw Mr. Blackwell shoot towards the crowd of people, and he saw Mr. Peterson get shot in the chest. Jacobe said that Mr. Peterson was shot immediately when the shooting started, and he saw both the [Petitioner] and Mr. Blackwell shooting at the crowd where Mr. Peterson was standing. Jacobe estimated that he heard more than ten gunshots.

Thomas Reid, Jr. testified that, on the day of the shooting, he pulled into the parking lot at Parkway East and saw a "big crowd of people" watching Tristan and Mr. Majors. Mr. Reid attempted to break up the fight by pulling Mr. Majors off of Tristan. When Mr. Anderson began fighting with Mr. Majors, Mr. Reid heard a gunshot which he thought was meant to "scatter the crowd." Mr. Reid stated that the man who fired the first shot was wearing "dark-colored clothing." Then, he heard additional gunshots, and he ran from the area. As he was running, Mr. Reid realized that he had been shot and saw blood "gushing out" from his chest. He stated that he looked back and saw the [Petitioner] and Mr. Blackwell, who were standing in between two of the apartment buildings, shooting at him. Mr. Reid ran across the street, lay down in the grass, and told people around him that he had been shot. He stated that he did not see anyone other than the [Petitioner] and Mr. Blackwell shooting a gun that day.

JPD Officer Kevin Livingston testified that, on July 27, 2014, he responded to a report of "multiple shots being fired and possible multiple victims" at Parkway East. When he got to the scene, he found Mr. Reid

lying on the ground between two apartment buildings. Officer Livingston attempted to calm Mr. Reid and to assess Mr. Reid's injuries. He testified that Mr. Reid was shot in the upper body, and he rendered aid until an ambulance arrived. Officer Livingston stated that he was one of the first officers on the scene and that there were a large number of people around, and he described the scene as "pretty chaotic[.]"

Sergeant Donald Lowe of the JPD testified that he also responded to Parkway East. When he arrived, he saw "several people out there ... running around screaming[,]" and he saw Mr. Reid lying in the grass. As he retrieved his medical bag from his patrol car, Sergeant Lowe was informed that Mr. Peterson had been shot and that he was inside a nearby apartment. Sergeant Lowe located Mr. Peterson inside that apartment. Mr. Peterson was lying in the kitchen floor in a large pool of blood. Mr. Peterson had no pulse and was unresponsive. Sergeant Lowe explained, "I tried to do whatever I could for him, but it didn't appear that he was still alive[.]" He secured the apartment and stayed with Mr. Peterson until EMS arrived.

Paul Spencer, a supervisor with Medical Center EMS, testified that he responded to the scene of the shooting and was directed inside an apartment by police officers. There, he found Mr. Peterson lying face-down on the floor of the kitchen. He noticed that a large amount of blood had already coagulated on the floor and on Mr. Peterson. Mr. Spencer rolled Mr. Peterson onto his back and determined that he was not breathing and had no pulse. Mr. Spencer saw what appeared to be a small wound to the center of Mr. Peterson's chest.

JPD Investigator Marvin Rodish, Jr., testified that he was called to process the scene at Parkway East. He met with patrol officers and assessed the scene for potential evidence. Investigator Rodish also took several photographs of Mr. Peterson inside the apartment. He testified that one photograph showed Mr. Peterson lying face-up in the kitchen and depicted the upper torso down to the knee area. A second, "close-up" photograph showed Mr. Peterson's face and head. From the photographs, Investigator Rodish identified a "circular hole" in Mr. Peterson's upper torso.

…

- 6 -

Investigator Rodish further testified that he collected two projectiles, one flattened-out piece of metal, two baseball bats, and some .45 caliber shell casings from the crime scene. He stated that he found the shell casings near the sidewalk that ran between two buildings. He found the projectiles in the parking lot. Investigator Rodish stated that he did not find any .380 shell casings and that no firearms were recovered from the scene. Investigator Isaiah Thompson testified that he was the lead investigator in the case for the JPD. He initially went to the crime scene where he interviewed multiple witnesses. Investigator Thompson eventually developed the [Petitioner] and Mr. Blackwell as suspects, leading to their arrests. Once the [Petitioner] was in custody, Investigator Thompson interviewed him. The [Petitioner] signed a waiver of his Miranda rights and provided the investigator with a handwritten, signed statement. In his statement, the [Petitioner] admitted to being at Parkway East at the time of the shooting, but he denied being at the scene of the fight. The [Petitioner] initially told Investigator Thompson that he left the apartment complex before police arrived with his girlfriend in her Ford Focus. However, when Investigator Thompson showed the [Petitioner] a police photograph of the scene showing his girlfriend's Ford Focus at the scene with police tape around it, the [Petitioner] changed his story and said that he left with "someone else." Investigator Thompson testified that he identified the [Petitioner] from the cell phone video and stated that, on the video, the [Petitioner] had on a gray shirt, dark-colored pants, and a gray and yellow hat "turned backwards." He also identified Mr. Blackwell in the cell phone video and stated that Mr. Blackwell had on orange shorts. Investigator Thompson stated that there were no firearms recovered from the crime scene. Additionally, Investigator Thompson found no evidence, such as casings or projectiles, to indicate that shots had been fired towards the Defendant[Petitioner]. He explained that the only projectiles found at the scene were in the opposite direction from where the [Petitioner] and Mr. Blackwell had been standing.

Fred Lytton testified that, in October 2014, he was an inmate at the local jail and shared a cell with the [Petitioner]. Mr. Lytton and the [Petitioner] discussed the [Petitioner]'s case, and Mr. Lytton learned that the [Petitioner] was in jail for murder. The [Petitioner] told Mr. Lytton that he was involved in a "shootout with some gang members" at an apartment complex. The [Petitioner] was at the apartment complex for a birthday party when he noticed a guy who previously had a confrontation with his cousin "and [had] helped beat her up." He said that his cousin's boyfriend

- 7 -

pulled up and wanted to fight the guy, but the guy "had to call his gang chief[.]"

The [Petitioner] told Mr. Lytton that he had purchased a .380 caliber gun from Mr. Blackwell and that he had the gun at the birthday party. The [Petitioner] said that Mr. Blackwell brought a .45 caliber weapon with an extended clip to the party. The [Petitioner] said that, during the fight, he and Mr. Blackwell retrieved their guns from inside the apartment. The [Petitioner] then saw a gang member at the fight go to a car and "g[e]t something." According to the [Petitioner], someone in the crowd said to Mr. Blackwell, "I don't know what you're doing with your hand or anything," and Mr. Blackwell pulled out his .45 gun and started shooting at the crowd. The [Petitioner] admitted that he fired first and that his "first shot was in the air" and "[t]owards the crowd." When he heard Mr. Blackwell's gun go off, the [Petitioner] said he "fell back behind a wall ... to try to get cover till he unloaded his whole clip." On cross-examination, Mr. Lytton stated that the [Petitioner] told him that, when he fell back behind the wall, a large group of gang members started shooting at him.

Dr. Adele Lewis testified that she was a forensic pathologist and the interim Chief Medical Examiner for the State of Tennessee. Dr. Lewis stated that she performed the autopsy on Mr. Peterson. She first took an x-ray of the body, which showed a bullet lodged in the right side of Mr. Peterson's back. During the autopsy, Dr. Lewis discovered that the bullet entered Mr. Peterson at the base of the neck, went through his breastbone, and then struck the major blood vessels to the heart. The bullet then lodged underneath the skin of the right side of the back. Dr. Lewis stated that the cause of death was a gunshot wound to the torso. She stated that she retrieved the bullet from Mr. Peterson's body, and it was sent for testing.

Special Agent Kasia Michaud testified that she worked as a forensic scientist in the Firearms Identification Unit of the Tennessee Bureau of Investigation. Agent Michaud explained that she received three bullets and five cartridge cases to test in connection with the [Petitioner]'s case. She examined the cartridge cases and determined that all five cartridge cases were fired from the same firearm. She then examined the bullets and found that two of the bullets were .45 caliber bullets based upon their size and weight. Agent Michaud determined that the final bullet, which had been retrieved from Mr. Peterson's body by the medical examiner was "consistent with a .380 auto caliber bullet" based upon its size and weight.

…

The trial court sentenced the [Petitioner] to consecutive sentences of twenty-five years for second degree murder and two years for reckless endangerment, for an effective sentence of twenty-seven years' incarceration.

*State v. Jakeil Malik Waller*, No. W2015-02361-CCA-R3-CD, 2016 WL 7242816 (Tenn. Crim. App. Dec. 15, 2016), *perm. app. denied*, (Tenn. Mar. 9, 2017) (footnotes omitted).

## Post-Conviction Hearing

Trial counsel testified at the post-conviction hearing that he met with the Petitioner five or six times before trial and that some meetings were conducted through video conferencing. Trial counsel met with at least three potential witnesses before trial, Mr. Ladarius House, Mr. Martel Majors, and Ms. Ayanna Savage. He recalled that there may have been an offer that the Petitioner plead guilty and receive a twenty-year sentence to be served at one hundred percent.

The theory of the defense at trial was that the shooting was chaotic. Trial counsel explained that he looked into a theory of self-defense, but decided that "to be self[-]defense you essentially have to admit that you shot the person and we didn't have any admission that [the Petitioner] had shot Mr. Peterson." Trial counsel explained that he sought to prove, through cross-examination of the State's witnesses, that no one who was present at the apartment complex really knew who the shooter was. He sought to discredit their testimonies by highlighting the many inconsistencies in their recollections of the shooting. Trial counsel explained that he did not call any of the eight witnesses whom he had subpoenaed to testify "because their statements were inconsistent with what some of the other proof was that we knew to be true based upon my conversations with [the Petitioner] and some other physical evidence." Trial counsel specifically explained that was why he did not call Ms. Savage as a witness. He believed that her testimony, based on his prior discussion with her, was inconsistent with the video evidence. The post-conviction court questioned trial counsel about his interview with Ms. Savage. Trial counsel elaborated:

She had told me essentially that they were at this house or apartment for a birthday party and essentially that [the Petitioner] was not out there at the time of the shooting, but the video showed otherwise which I didn't want to put her up there and have that statement be brought out when it clearly showed he was out there at that area.

- 9 -

Trial counsel explained that he decided not to put on any proof because he believed that the State had not carried its burden. He testified that he and the Petitioner discussed this decision. Trial counsel remembered having a conversation with the Petitioner about whether he wished to testify, and the Petitioner decided he did not wish to testify. On cross-examination, trial counsel stated that there was no indication that the Petitioner suffered from any mental deficiencies.

The Petitioner presented the testimony of several witnesses, who stated that they saw men other than the Petitioner and his brother carrying guns to the fight, that they saw men threatening onlookers with bats, and that they were ready to testify at trial but were not called by trial counsel. Ms. Shaquanna Brown, the Petitioner's cousin, was one of the women involved in the altercation that led to the fight and, ultimately, the shooting. She testified that she was in the apartment where the birthday party was occurring on the day of the shooting. She was in the kitchen cooking in preparation for Mr. Tyler Wade's birthday. She saw guns being fired as she watched through the window. She observed at least fifty people outside at the time of the shooting. She recalled seeing several men carrying guns prior to hearing any gun shots. When Ms. Brown heard shots, she hid and tried to protect the children who were present inside the apartment. While she was hiding in the apartment, she heard more than eight gunshots. Ms. Brown stated that she was present at the trial and was willing to testify. She recalled that trial counsel had asked her questions about the shooting and that she told him what she had seen. She said trial counsel explained after the close of the State's proof that he believed that the trial was going in the Petitioner's favor and there was no need for her to testify. On cross-examination, Ms. Brown admitted that she never talked to law enforcement about the shooting because there were people who were threatening her. Ms. Brown admitted that she did not see the individual who was shooting.

Ms. Cindy Wade, the mother of Ms. Brown, testified that Ms. Brown was involved in an altercation with another woman the day before the shooting. Ms. Wade observed the fight between Mr. Majors and Mr. Tristan Cook from the side walk. She stated that there were gang members watching the fight and that she knew they were in a gang because they were wearing black and red. She admitted that she never approached trial counsel with this information. She did talk to trial counsel at some point. She testified that she saw "J.B." and Mr. Robert Cook fire guns and did mention this to trial counsel prior to the day of trial. She remembered that there were several individuals, including one of the victims, Mr. Peterson, who were threatening people with baseball bats.

On cross-examination, the prosecutor asked Ms. Wade whether she was inside or outside the apartment at the time the shooting began. At first, Ms. Wade responded that she was inside, then she immediately changed her answer and stated that she was outside

on the sidewalk at the time of the shooting. When shots were fired, Ms. Wade ran to her apartment. She did not recall seeing the Petitioner once she returned to her apartment.

Ms. Ayanna Savage, the mother of the Petitioner's child, also testified that she attended the birthday party. While inside the apartment, she noticed four men walk past the apartment, each holding a bat or stick. She remembered the Petitioner and Mr. Blackwell exiting the apartment. Ms. Savage testified that she observed J.B. and Mr. Robert Cook with guns. The Petitioner was standing behind her while they were watching the fight. While they were watching the fight, Mr. Peterson threatened her with a baseball bat because she would not move. She testified that she was standing in front of Mr. Blackwell defending him from another man who was trying to fight him. She was outside when the shots fired. She ran as soon as she heard the shots and did not see who actually fired a gun.

After the shooting, Ms. Savage gave a statement to Investigator Thompson, but she testified that she did not trust him. She testified that he came to her house multiple times to speak with her and that she refused to talk to him on two occasions. Ms. Savage said she spoke with trial counsel prior to trial. She said the first time she spoke with him face-to-face was at the preliminary hearing, but the Petitioner told her that he trusted trial counsel. Ms. Savage was present and willing to testify at the trial.

Mr. Ladarius House testified that he was at the apartment complex on the day of the shooting. He saw several people in the crowd, including Mr. Peterson, carrying baseball bats during the fight. Mr. House was in a breezeway between two apartment buildings when the fight began. He saw Mr. Peterson and another man threaten the Petitioner and Mr. Blackwell by swinging their baseball bats around. He did not see anyone fire a gun. He recalled seeing several men in the crowd carrying guns. Mr. House spoke with law enforcement after the shooting, but he did not tell the officers that he saw Mr. Peterson carrying a bat. Mr. House was present at the trial and willing and to testify. He did not recall speaking with trial counsel before the trial.

Mr. Martel Majors testified that he was involved in the fight that led to the shooting. He drove himself to the apartment complex. At first, he went to the birthday party. He was fighting Mr. Tristan Cook because he believed that Mr. Tristan Cook punched the mother of his child the previous day. Mr. Majors did not see who fired their guns and fled with his child when he saw someone pointing a gun at him. Mr. Majors could not identify who had pointed a gun at him. He also was not aware of the Petitioner's location during the fight. He testified he saw gang members with guns, bats, and poles. After the shooting, he gave a statement to Investigator Thompson, which he believed was consistent with his testimony at the post-conviction hearing. He stated that he was present at trial and willing to testify but that trial counsel told him that the "best

strategy" would be not to call him. He acknowledged that he had not told police that someone threatened to kill him or that people were threatening him with poles.

The State recalled trial counsel as a witness. Trial counsel remembered meeting with Ms. Savage at his office and again at city court. After listening to the witnesses who testified at the post-conviction hearing, trial counsel stated that he believed some of the testimony was "somewhat different than what I can recall [the witnesses] telling me." Trial counsel did not believe that the testimony of those witnesses would have changed the outcome of the trial. He clarified that he and the Petitioner discussed the decision to not call any witnesses. Further, trial counsel stated that he obtained discovery from the State and that he had full knowledge of the potential defense witnesses' testimony.

The post-conviction court entered a written order denying the Petitioner post-conviction relief. The post-conviction court found that the Petitioner failed to prove his allegations of ineffective assistance of counsel by clear and convincing evidence. The post-conviction court credited trial counsel's testimony. Further, the post-conviction court found that trial counsel "personally interviewed several potential defense witnesses, including Ms. Savage, Mr. Majors, and Mr. House. He found that these potential defense witnesses were 'very inconsistent' with what they said they saw and with what the State's proof (the video and pictures) showed." The post-conviction court determined that trial counsel's decision to not call the witnesses was a reasonable strategic decision. The post-conviction court specifically found that the Petitioner "failed to present any credible evidence that his trial counsel failed to represent him properly at trial." The Petitioner now appeals the post-conviction court's decision.

## ANALYSIS

The Petitioner maintains that trial counsel was deficient for failing to call three eyewitnesses, Ms. Savage, Mr. House, and Mr. Majors. Additionally, the Petitioner argues that trial counsel was ineffective for failing to investigate because he did not personally interview each of the eight witnesses whom he had subpoenaed for trial. The State maintains that trial counsel made the strategic decision not to call the witnesses based on the inconsistencies in their recollections of the shooting.

The Tennessee Post-Conviction Procedure Act guarantees relief "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A petitioner seeking post-conviction relief has the burden of proving the allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the

conclusions drawn from the evidence.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)).

A claim of ineffective assistance is a mixed question of fact and law. *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011). The post-conviction court's finding of fact "are conclusive on appeal unless the evidence preponderates against them." *Grindstaff*, 297 S.W. at 216. However, this court's review of a post-conviction court's conclusions of law is de novo with no presumption of correctness. *Nesbit v. State*, 452 S.W.3d 779, 786 (Tenn. 2014).

The Petitioner maintains that he received ineffective assistance of counsel. Accordingly, the Petitioner must present facts establishing that: (1) trial counsel's performance was deficient; and 2) the deficient performance caused the Petitioner to be prejudiced. *See Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004) (citing *Strickland v. Washington*, 466 U.S. 668, 678 (1984)). This court "need not address both elements if the petitioner fails to demonstrate either one of them." *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). To establish deficiency, the Petitioner is required to show that trial counsel's actions "fell below an objective standard of reasonableness under prevailing professional norms." *Wiley v. State*, 183 S.W.3d 317, 329 (Tenn. 2006). Trial counsel's performance is not deficient when the advice given is "within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to establish prejudice as a result of trial counsel's deficient performance, the Petitioner "'must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different.'" *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)).

Trial counsel had a duty to investigate and prepare for trial. *Nesbit*, 452 S.W.3d at 796. "Counsel's duty is 'to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Id.* (quoting *Strickland*, 466 U.S. 691). This court must not evaluate trial counsel's performance using "20-20 hindsight." *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013) (citing *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011)). Trial counsel's strategic decisions "are given deference but only when such choices are informed ones based upon adequate preparation." *Moore v. State*, 458 S.W.3d 411, 419 (Tenn. 2016).

The post-conviction court determined that trial counsel developed a reasonable trial strategy based upon a proper investigation. Trial counsel testified that he recalled speaking with Mr. Majors, Mr. House, and Ms. Savage prior to trial. He could not recall if he spoke to Ms. Brown and Ms. Wade prior to trial. Ms. Brown and Mr. House testified that they each spoke to trial counsel at the trial, but were never asked at the post-

conviction hearing if they spoke with him prior to the trial. Ms. Wade, Ms. Savage, and Mr. Majors recalled speaking to trial counsel before trial. The post-conviction court accredited trial counsel's testimony that the testimony of the potential trial witnesses was "very inconsistent with what they said they saw and with what the State's proof (the video and pictures) showed. Furthermore, their statements were also 'inconsistent' with what his own client, Jakeil Waller, had told him." The post-conviction court noted that at least five of the State's witnesses at trial identified the Defendant as the shooter.

The Petitioner also alleges that although trial counsel may have investigated Ms. Savage, Mr. House, and Mr. Majors, he was ineffective for failing to call them as witnesses because if they had testified, "the jury would have realized the Appellant had to react the way he did in order to defend himself." The Petitioner notes that trial counsel did not ask for a self-defense instruction. The State responds that trial counsel explained during the post-conviction hearing that trial counsel explored the possibility of pursing self-defense as a trial strategy but ultimately decided against it because the Petitioner "would have to admit that you shot the person and we didn't have any admission that [the Petitioner] shot Mr. Peterson."

Trial counsel explained that the theory of the defense "was that it was total chaos out there at the scene.… We argued that basically everybody was unreliable." At least one of the State's witnesses testified that the co-defendant was the one who shot the murder victim. Trial counsel believed that the State had not met its burden of proving the elements of second degree murder and believed that the witnesses he had subpoenaed would testify inconsistently with the physical proof, potentially hurting the Petitioner's case. The fact that a particular strategy or tactical decision failed does not by itself establish deficiency. *Goad*, 983 S.W.2d at 370.

We conclude that the Petitioner has failed to demonstrate that trial counsel was deficient. We need not address the second *Strickland* element because the Petitioner has failed to establish that trial counsel's performance was deficient. *Kendrick*, 454 S.W.3d at 457.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE